**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PETER CHO and SIMON CHONG, | ) | |
| | ) | 04 C 5227 |
| Appellants, | ) | |
| | ) | Judge John A. Nordberg |
| | ) | |
| | ) | |
| J. WILLIAM HOLLAND, Trustee for the | ) | On appeal from the United States |
| Liquidation of the business of John Dawson & | ) | Bankruptcy Court for the Northern |
| Associates, Inc. | ) | District of Illinois, Eastern Division, |
| | ) | Case No. 99-A-536 |
| Appellee. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a bankruptcy appeal. Appellants Peter Cho and Simon Chong were officers and directors of the debtor – John Dawson & Associates, Inc. ("JDA") – which went out of business in October 1998. The Trustee who was appointed filed a complaint, alleging that appellants (I) converted 25 checks from JDA's account, (ii) manipulated put options in the company's account, and (iii) took office equipment, all in the year before the company closed. Believing that they would be indicted arising out of these same matters, which they later were, appellants invoked their Fifth Amendment privilege to the Trustee's discovery requests and deposition questions.

The Trustee nevertheless proceeded forward with a summary judgment motion against them. On July 18, 2003, the Bankruptcy Court granted the motion as to the 25 checks but denied it as to the two other allegations. In February 2004, after a number of status hearings, the Bankruptcy Court set a trial date for June 14, 2004. In the months leading up to the trial, the Trustee prepared the submissions required by the Final Pretrial Order. Appellants did not participate in this process. Therefore, a little over a week before the scheduled trial, the Trustee

filed a motion for default. Appellants responded a few days later by filing a motion for a stay pending resolution of the criminal trial. The Bankruptcy Court denied the stay motion, finding that the request was made too late, and then granted the default motion after appellants indicated that there was then no point in going forward with the trial.

Appellants now challenge the summary judgment ruling relating to the 25 checks and the two rulings (the stay and default motions) on the remaining claims. The gist of their appeal is that they were unfairly penalized for invoking their Fifth Amendment privilege and that the Bankruptcy Court should have waited so that the criminal case could go first.

## BACKGROUND

JDA was a company that purchased, sold, and traded securities, on its own behalf and on behalf of customers, through certain proprietary accounts. The company began operating in 1972. In October 1998, JDA went out of business when its clearing broker, Bear Stearns, froze its funds. On October 6, 1998, JDA informed the NASD and SEC that it was in violation of its net capital requirements.

In April 1999, JDA was ordered liquidated pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.* The Bankruptcy Court appointed J. William Holland as Trustee who initiated this adversary proceeding against Cho, Chong, and other former JDA individuals.

In the second amended complaint, the Trustee alleged that Cho and Chong, in the year before the business closed, directed the company's CFO, Douglas Samuels, to write 25 checks from the company's bank account. These checks totaled $404,496.46. Some of them were written to Cho and Chong; some were written to cash and then cashed by Samuels who gave the

money to Cho and Chong; and some were written to other JDA individuals not involved in this case. The Trustee also alleged that appellants manipulated the sale of certain put options in a way that allowed them to transfer an additional $149,960 from JDA's proprietary accounts to an account held by Chong's father. Finally, the Trustee alleged that appellants removed computers and other office equipment valued at $137,075 from JDA's offices.[1]

During this general period, Cho and Chong learned that the U.S. Attorney's office was investigating possible criminal charges relating to the demise of JDA. Cho and Chong therefore decided to invoke their Fifth Amendment privilege to almost every request and question posed by the Trustee in both written and deposition discovery.

## The Summary Judgment Motion

On November 15, 2002, the Trustee moved for summary judgment against appellants and the other JDA individuals. The Trustee attached copies of the 25 cancelled checks written on JDA's accounts, account statements, affidavits, and an expert report of Edward Chez. Appellants filed a response brief and a statement in response to the Trustee's statement of material facts. They relied heavily on the fact that they had invoked the Fifth Amendment and argued that they should not be penalized for doing so. They denied most of the Trustee's supporting facts with statements similar to this one: "Disputed as not supported by the evidence."

---

[1]Three claims were asserted against each of the two appellants: (i) a common law conversion claim; (ii) a fraudulent transfer claim under Section 548 of the Bankruptcy Code; and (iii) a claim under Sections 5 and 6 of the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), 740 ILCS §§ 160/1 *et seq*. The complaint also asserted claims against other JDA individuals.

On July 18, 2003, in a 16-page opinion, the Bankruptcy Court granted in part and denied in part the Trustee's summary judgment motion. In concluding that appellants had fraudulently converted the 25 checks, the Bankruptcy Court relied on the fact that Samuels, the CFO, testified in affidavit that appellants asked him to write the checks; that the company was insolvent during this time based on the Chez expert report; and that appellants had offered no evidence (either through their testimony or otherwise) suggesting a valid business reason for these transfers. (Op. at 13-14.) The Court summarized:

> The circumstances of making so many transfers to themselves during the Debtor's insolvency, combined with the adverse inference that may be drawn from Defendants' refusal to explain the purpose of the transfers, leads to only one conclusion – that the Defendants[] intended to empty the coffers before their creditors were any the wiser.

*Id.* at 14.

Although the Bankruptcy Court granted summary judgment to the Trustee on claims relating to the 25 checks, it denied summary judgment on the claims against Cho and Chong relating to the put options and the office equipment, concluding that the Trustee had failed to meet his burden. (*Id.* at 15-16.)

### Default Judgment On The Remaining Claims

Several months after the summary judgment ruling, in September 2003, the Bankruptcy Court held a status hearing to determine how to address the remaining claims relating to the put options and equipment. Over the next five months, the Trustee's and appellants' counsel met with the Court at several status hearings during which time they discussed whether the Trustee was going to try these claims. During this period, the Trustee seemed uncertain as to what he would do.

For example, on October 1, 2003, the Trustee's counsel said that he would move to enter the partial summary judgment ruling "into a final order so that it could be appealed or enforced" and that he hoped to make a motion in 10 or 14 days. (Tr. at 2-3.) But no motion was made. On November 18, 2003, the Trustee apparently changed his mind, indicating that he did plan to try the remaining claims. Appellants' counsel stated that he had been waiting to find out whether the Trustee was going to try those claims. And the Bankruptcy Court noted: "I didn't know whether you were going to go ahead after the partial summary judgment. We never really got any hint from you on that." (Tr. at 11.)

Then, on January 21, 2004 the Trustee's counsel stated that he "believed" that the Trustee had decided to dismiss the remaining claims. But on February 11, 2004, the Trustee indicated that he was going forward with the claim. Apparently deciding that it was time to bring the matter to a more definitive conclusion, the Bankruptcy Court stated at this hearing that it would enter a Final Pretrial Order setting a firm trial date and would do so "before the end of [the] month" so that parties would have at least four months to get ready for trial. (Tr. at 11-14.) Appellants' counsel also stated at this hearing:

> And if [appellants] get indicted, we may well file motions to stay this proceeding. I don't know what we'll do. I recall at one time we were here on a status, you had indicated you weren't interested in trying the case before the criminal case was resolved.

(Tr. 15.)

On February 12, 2004, a grand jury returned a 71-page, 29-count indictment against Cho, Chong, and other JDA individuals. The indictment alleges that these individuals participated "in a scheme to defraud [JDA] and its customers of money, property and their intangible right of

honest service by means of materially false and fraudulent pretenses, representations, promises and omissions."

On February 20, 2004, the Bankruptcy Court issued the Final Pre-Trial Order setting the trial for June 14, 2004. (Appellee Ex. 7.) This Order required the parties to prepare a Pretrial Submission that included witnesses, exhibits, and stipulations and that they prepare findings of fact and conclusions of law. The parties were aware, based on a clear warning in all capitals in the first paragraph of this Order, that failure to comply with the requirements of the Order could result in sanctions, one of which was a default judgment.

In preparation for trial, and in compliance with the Final Pretrial Order, the Trustee attempted to work with appellants. However, counsel did not respond nor participate in the process. Specifically, on May 5, 2004 and again on May 17, 2004, the Trustee's counsel asked counsel for appellants whether they would be participating. The Trustee's counsel did not receive an answer. Later in May, the Trustee's counsel made phone calls and wrote letters in a further attempt to find out whether appellants were participating. Appellants' counsel again refused to give a clear answer, nor did counsel participate in the process. Therefore, on May 27, 2004, the Trustee prepared and filed his version of the Pretrial Submission along with his proposed Findings of Fact and Conclusions of Law. Appellants never submitted any separate findings or conclusions of law.

On June 6, 2004, the Trustee filed a motion for default judgment. This motion described in detail appellants' failure to abide by the Pretrial Order.

On June 7, 2004, appellants opposed that motion and filed a motion for stay of the trial pending resolution of the criminal case.

At a hearing on June 8th, the Bankruptcy Court denied the motion for a stay and granted the motion for a default judgment, stating:

> Very frankly, there has been very little attention paid to this case by the
> defendants, as I recall, and I think the record will show without question.
> Normally, I would agree with what counsel has said.  It seems to me to be judicial
> in most instances to delay a trial where there is a criminal case pending.
> However, in this situation, I am a little disturbed, more than a little disturbed by
> the fact that they always come in at the last moment.  Everything is done, nothing
> happens, then you come in and say well, you don't want to try.  I don't see it.

(Tr. at 2-3.)  The Court then asked appellants' counsel if he had any comments.  Counsel answered: "Judge, I don't disagree that we have not been attentive to this."  (*Id.* at 3.)  Counsel went on to state that the Bankruptcy Court had at one point indicated that it was "inclined to grant a stay," although counsel also acknowledged that at another point the Court indicated that it was *not* so inclined.  (*Id.* at 4-5.)  The Trustee's counsel complained that appellants' counsel should have made the stay motion "before the  [T]rustee invested the time and resources [] to prepare for trial."  (*Id.* at 8.)

The Court then noted that appellants had not supplied the Trustee with anything to attach to the pretrial order nor had they offered their own submission.  (*Id.* at 9-10.)  The Court then asked whether the parties were "set to go" on the 14th at which point appellants' counsel interjected:

> Judge, if it would make things easier, I talked to [the Trustee] about this earlier
> today.  As you have already denied our motion to stay, [] there is no reason for
> anybody to appear on the 14th.  We are not going to contest the case. [M]y clients
> would be taking the Fifth Amendment. [] So I think there's a way to save the
> court and counsel the trouble, we could enter into some type of [] default
> judgment.

(*Id.* at 10.)  On June 15, 2004, the Bankruptcy Court entered the Default Order granting the Trustee judgment in the amount of $149,960 on the put options claim.  The Trustee voluntarily dismissed the claims based on the alleged conversion of office equipment.

On January 26, 2005, the United States filed a superseding indictment, naming former JDA employees, including Samuels.  *United States v. Cho*, No. 04-c-0166.  According to this docket sheet, a trial was set to begin before Judge Zagel on February 13, 2006.  It was subsequently resent for March 21, 2007.

## STANDARD OF REVIEW

This Court will review the Bankruptcy Court's summary judgment order under a *de novo* standard.  *See In re Midway Airlines, Inc.*, 383 F.3d 663, 668 (7th Cir. 2004).  However, we will review the Bankruptcy Court's stay and default orders under an abuse of discretion standard. *See Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 850 (7th Cir. 2002) (denial of stay motion reviewed for abuse of discretion); *Swaim v. Moltan Co.*, 73 F.3d 711, 716 (7th Cir. 1996) ("This Court will reverse a district court's default judgment only upon finding an abuse of discretion.").

## ANALYSIS

**I.    The Bankruptcy Court's Summary Judgment Ruling On The Conversion And Fraudulent Transfer Claims.**

The primary focus of this appeal is the Bankruptcy Court's summary judgment order on the transfer of the 25 checks and in particular whether its decision rested too heavily on appellants' invocation of their Fifth Amendment rights.[2]  This global argument, which surfaces

---

[2]The Bankruptcy Court stated that appellants were liable under "*either* a theory of conversion *or* a theory of fraud."  (Op. at 14; emphasis added.)  It thus appears that the ruling

-8-

in several places in appellants' brief, will be addressed in Section I.A below. Appellants also raise several narrower arguments, which will be addressed in Sections I.B and C.

    **A.**    **Did The Bankruptcy Court Place Too Much Weight On Appellants' Invocation Of Their Fifth Amendment Rights?**

In answering this question, the parties focus on the guidelines set forth in Seventh Circuit's decision in *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391-92 (7th Cir. 1995), which in turn was relying on the Supreme Court's decision in *Baxter v. Palmigiano*, 425 U.S. 308 (1976). In *Seguban*, the Seventh Circuit reversed the district court's grant of summary judgment to a bank that had brought RICO, fraud, and other claims against a former teller (and her husband) who allegedly stole $940,000 from the bank over a 12-year period. 54 F.3d at 388. The Segubans, like appellants here, asserted their Fifth Amendment privilege in the civil case because a criminal investigation was underway. *Id.* Concluding that the Segubans failed to offer any evidence, the district court granted summary judgment to the bank, which under a RICO treble damages provision resulted in a judgment of $2,820,000. *Id.*

The Seventh Circuit discussed the general issue of how a court may weigh a defendant's Fifth Amendment silence in a civil case when considering a summary judgment motion brought against that defendant. The Seventh Circuit did not set forth any mechanical test but instead noted two broader principles. First, the Court made clear that, even on summary judgment, it is permissible to draw an adverse inference against a party in a civil proceeding who remains silent in face of incriminating evidence. *Id.* at 390. It noted that this rule had been "widely recognized" in the "two decades since *Baxter*." *Id.* Second, at the same time, the Seventh

---

should be affirmed if we find that judgment was warranted under any one of the three claims against appellants.

Circuit noted that this inference is only permissible if the court conducts an analysis of the other evidence, an obligation that must be "more than perfunctory." *Id.* at 390-92. Stated differently, a judgment may not be based directly, automatically, or solely on Fifth Amendment silence. *Id.*

Appellants contend that *Seguban* not only supplies the principles necessary to decide this case but that it also is so factually similar that it automatically leads to the same result here. We are not persuaded. Although *Seguban* does involve superficially similar facts, the Seventh Circuit's ruling rested on two larger concerns not present here. First, the Seventh Circuit was troubled by the fact that the district court's analysis consisted of essentially a one-sentence conclusion without any discussion of the evidence. *Id.* at 392-93. Second, the Seventh Circuit also was concerned by the fact that the bank was awarded treble damages based on shaky legal theory. The Court noted that the bank's RICO theory – that the teller was conducting a RICO enterprise defined as the bank itself – was "to say the least, questionable" under the prevailing law. *Id.* at 393. And the Court further noted that it was this legal theory that was "the sole basis for the Bank's receipt of nearly $3,000,000 in trebled damages." *Id.*[3]

Given that our belief that *Seguban* does not compel a specific result here, we must apply its general principles. As discussed below, we believe that the Bankruptcy Court did, consistent with the mandate of *Seguban*, analyze the evidence in a way that was more than perfunctory. Therefore, it could legitimately draw an adverse inference against appellants. In their briefs,

---

[3]The Seventh Circuit remanded the case so that the District Court could analyze these issues in greater detail. Subsequently in *LaSalle Bank Lake View v. Seguban*, 937 F.Supp. 1309 (N.D. Ill. 1996), the District Court issued a lengthier opinion in which it reached largely the same result. Thereafter, according to the docket sheet, the parties entered into a settlement agreement pursuant to which judgment would be entered against the bank teller but the claims against her husband would be dismissed.

appellants effectively take the position that *no* inference can be drawn, which is clearly contrary to *Seguban* and other cases. The more difficult question – and the one for which there is no mechanical test – is how much weight may be given to such an inference. *See generally see National Acceptance Co. of Am. v. Bathalter*, 705 F.2d 924, 932 (7th Cir. 1983) (noting that this is an area of the law in which there inevitably will be some "tension"). Although both sides have made reasoned arguments, after reviewing the record *de novo*, we agree with the Bankruptcy Court that there was sufficient other evidence, when combined with appellants' refusal to offer any explanation, to justify summary judgment.

To begin with, it is clear from the length and tone of the opinion that the Bankruptcy Court took these issues seriously and did not make any knee-jerk conclusion based on appellants' assertion of the Fifth Amendment. The Court, in its 16-page opinion, summarized and then evaluated the evidence. The Court specifically considered whether there might be some explanations for these transfers but concluded, almost reluctantly, that appellants failed to offer any evidence. *See* Op. at 14. Moreover, the Court did not accept the Trustee's argument wholesale as it rejected the Trustee's claims regarding the November put options and the office equipment. It did so even though appellants had also invoked their Fifth Amendment to those claims just as they had done to the claims relating to the checks. The Court specifically pointed out gaps in the Trustee's case with respect to these claims, and noted that the Trustee should have drawn a more "definitive connection" between the transactions and should have offered "better proof." (*Id.* at 14-15.) This analysis is far from perfunctory.

Based on our own review of this same evidence, we also find that it was enough to support the use of the adverse inference and in turn to support the granting of summary

judgment. First, as discussed further in Section I.C, the Trustee has established that JDA was insolvent during the one-year period in which these 25 checks were issued. Second, the Trustee further established, through the testimony of Samuels, that appellants directed him to execute these checks. Third, appellants offered no evidence that would suggest any legitimate business reason for these transfers.

Because these 25 checks were a key part of the Trustee's case, it is helpful to begin by listing them by date, number, dollar amount, and payee:

- 10/14/97   13201   $50,000   Chong
- 11/11/97   13341   $6,000   Cho
- 11/12/97   13342   $3,500   Chong
- 11/26/97   13391   $3,500   Chong
- 11/28/97   13394   $10,000   Cho
- 12/02/97   13410   $7,000   Cho
- 12/02/97   13409   $3,000   cash
- 12/02/97   13907   $5,000   cash
- 12/18/97   13507   $3,000   cash
- 01/12/98   13854   $2,430   Willis
- 03/10/98   13848   $4,977   Cho
- 04/07/98   13963   $3,400   Cho
- 04/21/98   14020   $8,031   Willis
- 04/22/98   14028   $3,000   cash
- 06/11/98   14210   $4,632   Cho
- 07/01/98   14288   $200,000   Chong
- 07/23/98   14347   $5,000   Willis
- 08/03/98   14408   $25,000   Cho
- 08/13/98   14443   $ 5,024   Willis
- 08/19/98   14466   $15,000   Cho
- 08/21/98   14475   $ 4,000   cash
- 08/25/98   14484   $15,000   Ken Ko
- 09/08/98   14530   $ 3,000   cash
- 09/16/98   14577   $12,000   Chong
- 10/05/98   14628   $ 3,000   cash

(Appellee Br. at 17-18 (rounded off to dollars and arranged chronologically).)

As can be seen, there were many checks, some of them for substantial sums. According to Samuels, appellants asked him to write these checks from JDA's bank account. We have no explanation for why these checks were written. The checks do not contain any indication on their face as to their purpose. No testimony has been offered to explain them. Nor has any corporate or accounting records been produced to suggest that they were for a legitimate corporate purpose.

These checks thus create an explanatory vacuum into which questions are naturally drawn. Why this many checks during this one-year period? It would seem that 25 checks to corporate insiders is a large number, although we cannot say for sure given that we do not know how many such checks the corporation typically issued in a year. Why were the checks written for these particular (and varying) dollar amounts? Why did appellants ask Samuels in some instances to write the checks directly payable to them but in other instances asked him to write the check to cash and then to bring them the cash? Why were the checks written on these particular dates? There is no obvious regularity in their timing as would be expected by, for example, a bi-weekly payment of salary. Nor do these checks, insofar as we know, coincide with any identifiable corporate transaction or event nor do their dollar amounts match up with an earlier payment made to the corporation by appellants.

When confronted with this evidence, appellants declined to provide any explanation even though they were the ones who directed that the checks be issued and even though they were closely involved in the day-to-day operations of the business. Cho was the CEO in charge of daily operations. Chong was an officer and a director who traded securities in the company's proprietary accounts. Rather than provide an explanation, appellants decided to invoke the Fifth

Amendment. Given the questions raised by these 25 transfers, it is reasonable and permissible to draw an adverse inference. Appellants have "remained silent [] in the face of evidence that incriminated [them]." *Baxter*, 425 U.S. at 318; *see also Securities Exchange Commission v. Colello*, 139 F.3d 674, 677-78 (9th Cir. 1998) (affirming summary judgment: the district court was within its discretion to shift the burden of proof to a defendant who invoked his Fifth Amendment right and refused to explain why he had received investor monies); *see generally* Richard L. Scheff, Scott A. Coffina, & Jill Baisinger, *Taking The Fifth In Civil Litigation*, 29 Litigation 34, 35 (Fall 2002) ("Since *Baxter*, numerous decisions have permitted reliance on the Fifth Amendment privilege to be considered as part of the evidence establishing civil liability.").

It is important to remember that appellants not only decided to invoke their Fifth Amendment privilege, but they also chose not to offer any *other* evidence to support their claim that these checks could have been for a valid business purpose. As the district court explained in *Clancy v. Coyne*, 244 F.Supp.2d 894 (N.D. Ill. 2002):

> Coyne could have established this evidence in other ways, without waiving his Fifth Amendment rights. He could have, for example, subpoenaed third-parties for information relating to the expenses. He could have offered affidavits of those that received payments stating that the funds were used for the good of the Trust's beneficiaries. It is his failure to offer any evidence of these underlying transactions – not his failure to waive his Fifth Amendment rights – that results in Coyne being unable to show that any genuine issue of material fact exists.

*Id.* at 900. Here too, appellants did not offer any corporate records or testimony from other individuals (such as JDA's chairman), which they could have done to substantiate a claim that they were legitimately owed this money for compensation or as repayment for funds that they had previously given the company. Appellants did not even offer contextual evidence that would suggest that the timing, frequency, and amounts of these checks were normal in light of

either the company's historical practices or its then current business needs.  As the Bankruptcy

Court correctly pointed out, appellants did not come forward with any "specific explanation"

(much less provide supporting evidence) for these 25 transfers.  (Op. at 14.)

There is one limited portion of the Bankruptcy Court's ruling, however, that we find

requires a remand.  Appellants argue here that four of the 25 checks were made payable to Marc

Willis and one other check was made payable to Ken Ko and that the Trustee never presented

any evidence that Cho or Chong received this money.  (App. Br. at 13; App. Reply at 4.)  This

argument, although brief, was raised before the Bankruptcy Court.  (Sum. Jud. Br. at 5.)  But it

does not appear that the Court addressed it.  Nor has the Trustee responded to it in its response

brief here.  And we can find no independent ground to justify granting summary judgment as to

these five transfers, which total $35,485.72.  The appellants' invocation of the Fifth Amendment,

even when combined with the evidence above, is insufficient to establish that they received the

funds relating to these five checks.  This issue therefore must be remanded to the Bankruptcy

Court for further proceedings.

**B.      The Conversion Claim.**

Appellants raise three arguments directed specifically at the conversion claim.  The first

argument – that there was insufficient evidence to support the conversion claim – is essentially a

repackaging of the  argument discussed in Section I.A  and is rejected for the same reasons

already stated.

The second argument is similar but purports to rest on a different legal basis.  Appellants

assert that the Trustee is barred under the imputation doctrine from relying on the testimony of

Samuels because, as the CFO, his knowledge and conduct are imputed to JDA and thus to the

Trustee.  Appellants cite one case in support of this theory – *In re Sec. Investor Protection Corp. v. R.D. Kushnir & Co.*, 274 B.R. 768 (Bankr. N.D. Ill. 2002).  In reading this case, we can find nothing that would support appellants here.  As described in *Kushnir*, this doctrine states that the "fraudulent acts committed by officers of a corporation which are aimed at benefitting the corporation are imputed to the corporation."  *Id.* at 781.  There is no suggestion that Samuels, who has been named in the criminal indictment, was trying to benefit the corporation here.

Appellants' third and most developed argument is that the conversion claim is legally barred as a matter of law because, under the Uniform Commercial Code, a payee's endorsement of a check made payable to him cannot constitute conversion.  This argument is based on the Illinois Appellate Court's decision in *General Motors Corp. v. Douglass*, 565 N.E.2d 93 (Ill. App. Ct. 1990).  As set forth below, *Douglass* is inapplicable because it addressed a different situation with concerns not relevant here.

General Motors ("GM") had an arrangement with a car dealership in which it would periodically make payments owed to the dealership from a "holdback account."  *Id.* at 94.  GM at one point issued a check for $50,201.24 from that account believing that it owed the money to the dealership.  Later, GM realized that it had mistakenly overpaid the dealership approximately $38,000.  However, in the interim, the dealership's president who was unaware of the mistake had already cashed the check.  GM brought a conversion claim against the president based in part on the fact that he had cashed the check.  The Illinois Appellate Court rejected this argument, stating that the president could not have been liable for conversion "merely by" endorsing and negotiating a check.  *Id.* at 97.  The Court stated:  "[w]e refuse to say that [the

president] converted property which was voluntarily given to him in the first instance." *Id.* at 100.

In contrast here, there is no evidence to support a claim that the money was mistakenly and voluntarily given to Cho or Chong or that they, like the dealership president, honestly believed that they were legitimately owed the money. The allegations instead are that Cho and Chong specifically directed Samuels to write the checks with the specific intention of defrauding the corporation. If appellants' interpretation of *General Motors* were correct, a corporate insider could simply forge a check to himself and then claim that he is protected (at least from a conversion claim) under the payee rule supposedly set forth in *General Motors*. This cannot be the law.

In fact, several later cases have distinguished *General Motors* on these same grounds. For example, in *Wabash Independent Oil Co. v. King & Wills Ins. Agency*, 618 N.E.2d 1214 (Ill. App. Ct. 1993), the Illinois Appellate claim rejected the argument appellants are making here:

> The case before us is clearly distinguishable from the *General Motors* case. It is true that the checks that Wabash wrote were made payable to King & Wills, but *there is no question that the money at all times belonged to Wabash.*

*Id.* at 1219 (emphasis added); *see also Roderick Dev. Investment Co. v. Community Bank of Edgewater*, 668 N.E.2d 1129, 1135-37 (Ill. App. Ct. 1996) (pointing out that *General Motors* involved a situation where a party "voluntarily" transferred his property to another and where the money at issue was only one part of a larger lump-sum payment).

## C. The Fraudulent Transfer Claims.

Appellants make a number of arguments attacking these claims. First, appellants argue that Section 548 only avoids transfers made within one year of the petition and that 12 of the 25

checks are outside that period.  As to this argument, the Trustee responds, as it did before the Bankruptcy Court, that this point is immaterial given that the IUFTA contains a four year time limit that covers these 12 checks.  We agree.

Second, appellants argue that there is insufficient evidence of fraudulent intent.  This argument is essentially the same argument, discussed above, that the Bankruptcy Court gave too much weight to the adverse inference and fails for the same reasons.  In a related argument, appellants claim that the Trustee did not identify any creditors.  As the Trustee correctly points out, however, appellants failed to raise this argument before the Bankruptcy Court and it is therefore waived.

Third, appellants raise a number of facts and arguments all of which are designed to cast doubt in one way or another on the conclusion of the Chez report that JDA was insolvent at or near the time of the transfers.  Before addressing these arguments individually, we note two larger points.  In attacking the Chez report, appellants have not offered any expert of their own and have chosen instead to rely largely on what they believe are common sense and logical arguments made by their counsel.  In a related point, appellants do not offer any alternative solvency analysis of their own but instead rely on a series of isolated facts.

Appellants' arguments fall into four categories – (i) general criticisms of Chez's expertise and methodology; (ii) an attack on the proximity of the insolvency determinations; (iii) arguments based on the fact that other entities supposedly did not notice anything wrong; and (iv) arguments based on specific financial facts as of particular dates.  As explained further below, these arguments fail to create a genuine issue of material fact.  The problem with all of

them is that they fail to make any connection to the analysis in the Chez report, which is the central piece of evidence relied upon by the Bankruptcy Court.

**Chez's Qualifications and Methodology.** Appellants argue that Chez's expertise was in the wrong area and that his accounting methodology was too conservative. Neither argument casts doubt on his conclusion.

First, appellants argue that Chez is not an appraiser. (Br. at 17.) But as the Bankruptcy Court noted in rejecting this argument, appellants have failed to explain what assets or liabilities an appraiser would value given that Chez evaluated cash and securities. (Op. at 6 n.4.)[4] As the Trustee persuasively points out, it is hard to see how there could even be an under-evaluation of cash or of securities that are traded on an established market. (Appellee Br. at 31.)

Second, appellants fault Chez for using Generally Accepted Accounting Principles ("GAAP"). They claim that it is "well established" that financial statements prepared in accordance with GAAP are "not necessarily" the same as the fair market value of a particular date because GAAP "does not necessarily reflect economic reality." (Br. at 17.) Even accepting the premise that GAAP is overly conservative, this still does not prove that JDA was solvent because appellants have not attempted to show that another approach would have led to a different conclusion. Just because GAAP is conservative does not necessarily mean it is wrong as applied in this particular case. Chez stated that he analyzed JDA's "assets, liabilities, and solvency consistent with GAAP and with reference to the definition of insolvency" set forth in

---

[4]It should be noted also that Chez is a CPA with many years of experience. *See* Appellee Br. at 30 n.17.

the Bankruptcy Code.  (Appellee Br. at 30.)  Appellants have not pointed to any specific passage in the report in which Chez failed to carry through with this promise.

**The Timing Argument.**  Appellants complain that the Chez report, which states that JDA was insolvent on three particular dates, does not specifically state that JDA was insolvent on every one of the specific dates the 25 checks were issued.  The Chez report opines that JDA was insolvent as of three dates – October 31, 1997, November 30, 1997, and December 31, 1997. In response to this argument, the Trustee asserts that it is enough to show that JDA was insolvent "on or near" the date of each check.  We agree.

Appellants generally argue that the valuation must be made on the exact date of the transfer while the Trustee asserts that it is sufficient if the valuation was approximately six months before or after the date.  Each side cites to cases for its position.  After reviewing these cases, we are persuaded by the Trustee's argument under the undisputed facts of this case.  *See In re Sullivan*, 161 B.R. 776, 783 (Bankr. N.D. Tex. 1993) (evidence of insolvency six months *before* and six months *after* the August 1990 transfer was sufficient); *see also In re Join-In Int'l*, 56 B.R. 555, 560 (S.D. N.Y. 1986) ("A debtor can satisfy the requirements of Code § 548 provided the court finds it was insolvent 'proximately before or immediately after the time of [the] transfer.'") (quoting *Inland Security Co. v. Estate of Kirshner*, 382 F.Supp. 338, 344-45 (W.D. Mo. 1974).[5]

---

[5]*See also In re R. Purbeck & Assocs., Ltd.*, 27 B.R. 953, 955 (Bankr. D. Conn. 1983) ("Since insolvency at a given point in time is often difficult to demonstrate by direct proof, courts permit the trustee to show that the debtor was insolvent at one point in time and then prove that the same condition existed at the time of the subject transfer.") (cited in appellants' brief).

Appellants' timing argument is based on the notion that, although the Chez report opined as to JDA's insolvency in the latter three months of 1997, there is no evidence that JDA was insolvent during 1998. As an initial matter, it should be noted that 10 of the 25 checks are dated within a few weeks of one of the three Chez valuation dates. It also should be noted that in October 1998 JDA informed the NASD and the SEC that it was in violation of its net capital requirements and then went out of business.

Appellants' timing argument thus rests on the premise that sometime after December 31, 1997 but before October 1998, JDA's fortunes changes and it became solvent for an interim period before finally succumbing again to insolvency. The problem with this argument is that no facts support it. Appellants have not pointed to any material change in the company's business during 1998. *See Inland Security*, 382 F.Supp. at 346 (noting that "the alleged lack of direct proof of insolvency [on the date of the transfer] is adequately counterbalanced by the totality of the evidence, of the bankrupt's financial condition *during the year* [in which the transfer took place] and the sound evidentiary inference of insolvency based on the proof of insolvency immediately subsequent to the transfer date") (emphasis added); *cf. Purbeck*, 27 B.R. at 955 (valuation determination was not sufficiently close in time to transfer to establish insolvency because, in the interim period, it was undisputed that the debtor received a $200,000 capital investment).

**Reliance On Other Entities.** Appellants make a series of arguments all of which follow the same general line of reasoning; namely, that JDA was not insolvent because other parties supposedly did not notice any financial problems. Specifically, they claim that JDA's accountants, its CFO (Samuels), Bear Stearns, and the NASD did not conclude that JDA was

insolvent.  These arguments fail because appellants have not established any predicate for them.

It is not clear whether these entities were in a position to know the entire financial picture of the

company or that they had a duty to report on JDA's insolvency.  And even if they did have such

a duty, it cannot be assumed – as recent business history indicates – that accountants and other

entities will always raise red flags.  In sum, these arguments are too indirect to overcome the

specific conclusions of the Chez report.

      **Financial Facts.**  For similar reasons, the appellants' citation to various facts is likewise

unavailing.  These facts include:  (i) the Bear Stearns account upon which Chez relied as having

a negative balance as of December 31, 1998 had a zero balance by February 27, 1998; (ii) JDA's

CFO testified that in early 1998, JDA repaid a $1.2 million loan from Bear Stearns that was

outstanding in late 1997; and (iii) at the time JDA closed its business in October 1998, it had

assets in its Bear Stearns accounts of $600,000 to $750,000.

      The problem with these facts is, once again, they sit by themselves unconnected to each

other or to the larger financial picture of the company.  They are isolated facts, each referring to

a different transaction on a different date.  No connection is made to the Chez report nor to any

other balance sheet analysis.  No explanation is given as to whether, even if these facts are true,

they  would demonstrate that JDA's assets were greater than its liabilities.  As the Trustee

correctly points out, it does not mean anything to pick out one number out of a balance sheet.

This leads to a larger point, which cuts across all of appellants' insolvency arguments.

Appellants never refer to any specific portion of the Chez report; they do not quote from it; and

they do not explain where or how its conclusions are flawed.  In fact, we could not even find a

copy of the Chez Report in the lengthy record in this case.  It appears that appellants did not

designate it as part of the record.  For all these reasons and for the additional reasons set forth in the Trustee's brief, we are unpersuaded by appellants' insolvency arguments.[6]

## II.     The Stay And Default Motions.

Appellants argue that the Bankruptcy Court abused its discretion in denying appellant's motion to stay pending resolution of the criminal case.  The gist of this argument is that, because the Bankruptcy Court stated on a few occasions that it might wait until after the criminal trial was over and because the Trustee on several occasions stated that he was considering dismissing the remaining claims, the Bankruptcy Court should have granted the stay motion that was filed on the eve of trial.  In support of this argument, appellants offer various reasons for why it would have made sense to delay the civil trial – *e.g.* the criminal trial concerned the same subject matter, it would start in the near future; and it might achieve the same objectives sought in the civil trial.

The problem with this argument is two-fold.  As a factual matter, the record, which is summarized in the first part of this opinion and which is undisputed, simply does not support the notion that appellants could have genuinely believed that the Trustee was dropping these claims or that the Bankruptcy Court would automatically grant a stay motion no matter how late in the game it was filed.  It is true that appellants could have held out the hope, based on some comments made at earlier status hearings, that the Trustee would drop these claims.  But those comments were not definitive.

---

[6]In attacking the IUFTA fraudulent transfer claim, appellants rely on the same arguments made in attacking the Section 548 bankruptcy claim.  These arguments fail for the same reasons stated above.

More importantly, when the Bankruptcy Court in February 2004 set a firm trial date for June, any such uncertainty was eliminated and any prior equivocations were irrelevant. Despite the Bankruptcy Court's clear indication in February that the trial was going forward, the Trustee did not file a stay motion at that time. Then, after the Trustee made numerous contacts with appellants in May 2004, appellants still did not file a stay motion. All the while, the Trustee expended time and money preparing for the trial. Appellants only filed a stay motion after the Trustee filed his default motion, which was a week before trial. In sum, to the extent that appellants believed that the could file a stay motion at any point, they made unwarranted assumptions that were not justified by the factual record.

As a legal matter, appellants' argument attacking the denial of their stay motion misconceives the basis for that ruling. It was not based on the larger question of whether it is better to defer a civil trial when a criminal case is pending, which is the question appellants now argue in this Court. The Bankruptcy Court at the hearing stated that it generally was sympathetic to the notion of delaying the civil trial. However, the Court made clear that its ruling was not based on this broader question of the relative merits between staying a civil case versus moving forward but instead was based on the fact that the Court was "more than a little disturbed" by the fact that counsel had not been "attentive" to this matter and that counsel also had a history of "com[ing] in at the last minute." Counsel at the hearing did not dispute the truth of these assertions. The Court's ruling was thus a sanction – in fact one of the sanctions specifically mentioned in the Final Pretrial Order – and was not based on any determination as to the larger question appellants now argue. Those issues were not discussed at the hearing.

In sum, the Bankruptcy Court's ruling was reasonable based on the undisputed conduct of counsel. This ruling was not an abuse of discretion. Given this ruling, the Court's decision to grant the default motion also was not an abuse of discretion. In fact, after the stay motion was denied, it was appellants' counsel who suggested that a default judgment be entered because his clients were "not going to contest the case." *See* 6/8/04 Tr. at 10.

## CONCLUSION

For the reasons set forth above, the orders of the Bankruptcy Court in denying appellants' stay motion and in granting the Trustee's default motion are affirmed in all respects. The Bankruptcy Court's summary judgment order is affirmed in part and reversed in part, and this matter is remanded for proceedings consistent with this opinion. To give the parties the opportunity to see if they could resolve the one remaining and relatively limited matter without the necessity of a remand, we will delay entry of the final judgment order in this case for 4 weeks from the date of this opinion.

**ENTER:**

_____
**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** October 3, 2006